IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| SIXTO NUÑEZ | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | CIVIL NO. 98-2213 (JP) |
| | * | |
| CARIBBEAN INTERNATIONAL NEWS | * | |
| CORP., et al. | * | |
| | * | |
| Defendant | * | |

## OPINION AND ORDER

### I.   INTRODUCTION

The Court has before it Defendant's Motion for Summary
Judgment seeking the dismissal of Plaintiff's causes of action
under the federal copyright and trademark laws and under the local
intellectual property laws (**docket No. 16**); Plaintiff's Opposition
(docket No. 23), Defendant's Reply, and Plaintiff's Sur-Reply.

### II.   SUMMARY JUDGMENT STANDARD

Summary judgment serves to "assess the proof in order to see
whether there is a genuine need for a trial." Garside v. Osco
Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).  Under Rule 56(c) of
the Federal Rules of Civil Procedure, a summary judgment is in
order when "the record, including the pleadings, depositions,
answers to interrogatories, admissions on file, and affidavits,
viewed in the light most favorable to the nonmoving party, reveals

CIVIL NO. 98-2213(JP)              2

no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c);

see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st

Cir. 1999) (stating that summary judgment is appropriate when,

after evaluating the record in the light most favorable to the non-

moving party, the evidence "fails to yield a trial worthy issue as

to some material fact."); Goldman v. First National Bank of Boston,

985 F.2d 1113, 1116 (1st Cir. 1993); Canal Insurance Co. v. Benner,

980 F.2d 23, 25 (1st Cir. 1992). A fact is material if, based on

the substantive law at issue, it might affect the outcome of the

case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179,

181 (1st Cir. 1989). The Supreme Court has stated that "only

disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary

judgment. Factual disputes that are irrelevant or unnecessary will

not be counted. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242

(1985).

      In a summary judgment motion, the movant bears the initial

burden of "informing the district court of the basis for its motion

and identifying those portions of the [record] which it believes

demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the

CIVIL NO. 98-2213(JP)                3

movant does not bear the burden of proof at trial, it must show

that no reasonable fact-finder could find that the non-movant has

established the requisite elements of its claim.  Id. at 325.  Once

the moving party meets his burden of proof, the burden shifts to

the non-movant, who may not "rest upon mere allegations or denials

of . . . the pleadings, but . . . must set forth specific facts

showing that there is a genuine issue for trial."  Goldman, 985

F.2d at 1116; see Celotex, 477 U.S. at 324; Anderson, 477 U.S. at

248.

## III. UNCONTESTED FACTS

    El Vocero de Puerto Rico ("El Vocero") is a daily newspaper

published by Defendant Caribbean International News Corporation

("Caribbean"), which is distributed in Puerto Rico, as well as in

several cities in the continental United States.  Joyce Giraud

("Giraud") is a professional model, who in 1997, won the Miss

Universe Puerto Rico pageant, and as such, would represent the

island in the Miss Universe pageant.

    On October 23, 1997, El Vocero published a news article by

Jorge Luis Burgos ("Burgos") titled "Puerto Rico Miss Universe

Under Fire."  The article stated that several photographs in which

Giraud appeared "in the nude [and] in compromising positions" would

be shown that day, on the show "A Fuego" on Teleonce, a local

CIVIL NO. 98-2213(JP)                4

television channel.  According to the article, the photos in the possession of the producer of "A Fuego" could result in the removal of Giraud as Miss Universe Puerto Rico.  Burgos also wrote about a rivalry brewing between two Puerto Rico television stations, Teleonce and Telemundo, over the broadcasting rights of the Miss Universe Pageant and noted that such rivalry had ignited the controversy surrounding Giraud's fitness as a Miss Universe candidate as a result of the photographs.

At approximately 11:00 a.m. on October 23, 1997, two photographs were shown on "A Fuego," one in which Giraud appeared lying sideways and apparently naked ("Photo J") and another in which Giraud appeared standing behind male model Florentino "Tinno" Delgado, who was standing sideways and leaning forward ("Photo TJ").  The host of "A Fuego" conducted several man-on-the-street interviews asking for the opinion of passers-by as to whether or not they thought the photographs were pornographic.  Later that day, Giraud was interviewed by Teleonce regarding the allegations that she was unfit to retain the crown of Miss Universe Puerto Rico. Giraud was also interviewed that day on Telemundo during a television show called "La Comay."  Burgos was present on the set

CIVIL NO. 98-2213(JP)          5

during the interview, during which Giraud showed her composite containing one photograph in which she appeared to be naked.[1]

Ranier R. Rentas ("Rentas"), a photojournalist with El Vocero was accompanying Burgos in the "La Comay" set and was allowed to take several photographs of the interview. After the interview and at Burgos' request, Giraud gave Rentas her composite to scan several of its photographs. At no point did Giraud indicate that the pictures were not hers or that she was in any way impeded from giving out copies. The following day, October 24, 1997, and after scanning the photographs, Burgos returned the composite to Giraud.

On that same day, and with the front page lead "PR Miss Universe TV War Victim," El Vocero published on page 3 a news article titled "Fire Put Out by the Queen's Tears and Prayers." Photo J appeared on the front cover of the issue, except for the fact that the background of the front page was red and one of Giraud's arms does not appear. The article addressed the controversy concerning Giraud's photographs. Two of the photographs taken by Rentas during the interview in "La Comay" appeared with this news article, one of which showed Giraud showing

---

[1]    A composite is a compilation of photographs which models, their agents, and photographers circulate as samples among publicity executives, producers, and commercial firms in order to procure assignments.

CIVIL NO. 98-2213(JP)          6

her composite to the television cameras.  Such composite included
Photo J.   In the article, Plaintiff Sixto Núñez ("Núñez") was
identified as the author of the photographs.  Also on October 24,
1997, El Vocero ran another article titled "Teleonce Commentator
Asks for the Head of PR Miss Universe."

During that same day, Núñez heard a radio interview of show
business journalist Millie Cangiano, who commented as to the
"strong" nature of the photographs and that they might even be
considered "porno."  Núñez immediately called the radio talk show
host Carmen Jovet to express his dismay as to the events.

Thereafter, Núñez was contacted by and readily agreed to meet
with Burgos for an interview to clarify the events surrounding the
photographs.  In his interview, Núñez explained in ample detail the
reasons the photographs were taken and the process involved in
their preparation.  After the interview, Núñez drove Burgos to
Amnezzia modeling agency so that he could see other photographs
taken of Giraud which were related to the controversy.  Once there,
Núñez waited in the car and told Burgos to ask for the photographs.
Personnel of the modeling agency gave Burgos the composite of Tinno
Delgado where the Photograph JT appeared, one of the three
photographs in controversy.  In this picture, a fully clothed
Giraud appears standing to the left of Tinno, who is standing
sideways and appears to be naked.

CIVIL NO. 98-2213(JP)                7

    The next day, October 25, 1997, the controversy involving
Giraud once again appeared in the front page of El Vocero with the
lead headline "Swamp of Versions in TV War for PR Miss Universe."
The photograph in that day's front page also appears in the
composite which was given by Núñez during a job interview he had
with El Mundo newspaper.  That picture is identified as Photo TJ.
 Two news articles written by Burgos were published on page 3 of
that issue of El Vocero.  The first of which, titled "'Cannon
Fodder' in PR Miss Universe War," was a follow-up concerning the
polemics originally started by Teleonce and Telemundo.  In that
article, El Vocero stated that it published the photographs that
had ignited the controversy "so that The People will judge," as to
whether Giraud deserved to retain her crown as Miss Universe Puerto
Rico.  The second article of that day was titled "Photographer
Affirms" [Giraud] Did Not 'Strip' for His Camera" and included
Burgos' interview of Núñez conducted the day before.

    On October 28, 1997, El Vocero published a third front page
titled "Check to the Queen:  Either She Leaves or They Fire Her,"
which summarized the dilemma that Giraud was enduring at the time.
A total of six news articles were published on October 28, 1997,
regarding Giraud's fitness to retain her title as Miss Universe
Puerto Rico.  One of those articles, titled "Tinno Had a Tanga On

CIVIL NO. 98-2213(JP)                8

[When He Was] With [Giraud]" was accompanied by the third photograph object of this complaint, photo JT, already described above.  This news article consisted of an interview with Eddie Guerrero, a fashion designer who stated that he requested the photo shoot from Núñez for a "vanguard exhibition" for the fashion industry.  Photo TJ was obtained by Burgos from a composite that Núñez brought to El Mundo newspaper[2] about three months before the controversy started while looking for a job and had not made any claim or reservation as to the protection of the photographs.

The three photographs that started the controversy involving Giraud were published in El Vocero and were taken by Núñez at the request of Giraud's agent as a favor to the latter.  The photographs were published without Núñez's consent.  After the photo shoot and at Giraud's request, Núñez gave Giraud some of negatives so that she could have some enlargements made.  Photo J in which Giraud appears by herself was among the samples included in Giraud's composite. Photo JT was in Tinno's Composite and Photo TJ was in Núñez's composite.  The three photographs were known to people in the local fashion industry.

On November 16, 1998, Núñez filed a request to register two of the three photographs with the names "Joyce" and "Tinno and Joyce," before the Puerto Rico Copyright Office.  On November 17, 1998,

_____

[2] El Mundo and El Vocero are affiliated newspapers.

CIVIL NO. 98-2213(JP)                9

Núñez filed the three photographs the object of this Complaint with the United States Copyright Office.

## IV.  DISCUSSION

### A.    Copyright Claim and the Fair Use Defense

Caribbean contends that Plaintiff's Claim under the Federal Copyright Act of 1976 should be dismissed because the reproduction and publication of the pictures in question fall within the purview of the fair use exception.  In particular, Caribbean argues that because publishing the photographs was part of its mission to inform its newspaper readers, its actions are protected as news reporting.  Plaintiff counters Caribbean's arguments stating that its use of the fair use exception is loosely applied and outside of the proper context.

The federal copyright laws bestow upon copyright owners the exclusive rights to reproduce, distribute, transform, and exhibit their copyrighted works. See generally, Elliot Epstein & Andrew J. Zulieve, The Fair Use Doctrine:  Commercial Misappropriation and Market Diversion, 13 Me. B. J. 142 (1998).  To establish a claim for copyright infringement of a protected work, a plaintiff must show both ownership of a valid copyright and that the defendant copied the protected work without his or her authorization.  See Leibovitz v. Paramount Pictures Corporation, 948 F.Supp. 1214, 1218

CIVIL NO. 98-2213(JP)            10

(S.D.N.Y. 1996).  In the instant case, it is undisputed that Plaintiff owns the copyrights to the photographs in question and that Caribbean did not seek Plaintiff's authorization to publish them.

The federal copyright laws, however, create the fair use exception for defendants who have used and published a copyrighted work without the authorization of the copyright owner.  See 28 U.S.C. § 107; see also Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc., 621 F.2d 57 (2d Cir. 1980); Lotus Development Corporation v. Borland Intern. Inc., 788 F.Supp. 78 (D. Mass. 1992).  The fair use defense protects the use of a copyrighted work for purposes such as criticism, comment, and news reporting.  See Leibovitz, 948 F.Supp. at 1218.  In determining whether a defendant can successfully rely on this defense, a court shall consider the purpose and character of defendant's use, the nature of the copyrighted work, the amount and substantiality of the portion used, and the effect of the use on the potential market for the copyrighted work.  See Twin Peaks Production, Inc. v. Publications Intern., Ltd., 996 F.2d 1366 (2d Cir 1993).  Although considered a mixed question of law and fact, determining whether the unauthorized use of a copyrighted work is fair is fact-specific, and therefore, courts should be cautious in

CIVIL NO. 98-2213(JP)          11

granting summary judgments.  See <u>Wright v. Warner Books, Inc.</u>, 953 F.2d 731 (2d Cir. 1991); <u>Meeropol v. Nizer</u>, 560 F.2d 1061 (2d Cir. 1977); <u>Coleman v. ESPN, Inc.</u>, 764 F.Supp. 290 (S.D.N.Y. 1991). Although no single factor in the fair use analysis can trigger copyright infringement liability and the four part analysis is not to be applied in a rigid way, two factors are particularly important:  whether the unauthorized use of the work is for commercial purposes and whether the use of such copyrighted work has affected negatively, or has the potential to negatively affect, the market for the copyrighted work.  See <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569 (1994); <u>Leibovitz</u>, 948 F.Supp. at 1219; Elliot Epstein & Andrew J. Zulieve,  <u>The Fair Use Doctrine: Commercial Misappropriation and Market Diversion</u>, 13 Me. B. J. at 143.  Of these two, however, the most important element is the effect or potential effect of the use of the copyrighted work on the market.  See <u>Haberman v. Hustler Magazine, Inc.</u>, 626 F.Supp. 201 (D. Mass 1986).

       **1.**   **Purpose and Character of the Use of the Photographs**

       Before the <u>Campbell</u> decision, the four part fair use analysis was simpler because the commercial use of a copyrighted work was considered presumptively unfair. The <u>Campbell</u> Court, however, held that too much emphasis was being placed on the

CIVIL NO. 98-2213(JP)              12

commercial nature of the publication of a copyrighted work and that

all factors had to be considered in the fair use analysis.  See

Campbell, 510 U.S. at 570; Leibovitz, 948 F.Supp. at 1219.

Although not a litmus test, as stated above, the purpose and

character of the use is essential in the analysis.

Plaintiff states that due to the facts surrounding this

case, the purpose fueling the publication of these pictures was

strictly commercial.  Caribbean opposes such conclusion and states

that its purpose in printing the pictures was to inform the people

with regards to a newsworthy issue, the battle between Teleonce and

Telemundo over the rights to broadcast Miss Universe and the

fitness of Giraud to don the crown of Miss Universe Puerto Rico.

The Court finds that Caribbean sought to inform and gain

commercially, and therefore, these facts would neutralize each

other in the analysis of fair use.  See Haberman, 626 F.Supp. at

210.

In reaching this conclusion, the Court does not simply

rely on the fact that El Vocero is offered for sale.  News

reporting is not driven by commercial interests just because "'the

publication is sold rather than given to the public.'"  Id. (citing

Pillsbury Co. v. Milky Way Productions, Inc., 215 U.S.P.Q. 124, 131

(N.D.Ga. 1981).  Rather than being presented inside the newspaper,

CIVIL NO. 98-2213(JP)            13

two of the three photographs in controversy were shown to the prospective buyers of El Vocero by placing them on the cover. The October 24, 1997 issue of El Vocero had in its front page Photo J with a red background which shows Giraud lying sideways appearing to be nude. Inside the issue there are two articles regarding the stir caused by the photographs. The following day, El Vocero ran another front page with one of the controversial pictures, Photo TJ. In this picture, Giraud appears fully dressed and upright, while in front of her there is a male model, who appears to be naked and is standing sideways and leaning forward. It is no mystery that in the newspaper business, front covers are reserved for top stories. This is especially the case for newspapers like El Vocero, a newspaper which is sold largely on newsstands and on traffic lights. Therefore, having an enticing lead page will no doubt draw readers to purchase the newspaper. See id. at 211 (citing Rubin v. Boston Magazine Co., 645 F.2d 80, 82 (1st Cir. 1981)).

Despite the commercial motivations of Caribbean, the issues surrounding the publication of the photographs are newsworthy. The people who live in Puerto Rico are generally interested in issues such as who will be the island's representative to the Miss Universe pageant and what are her

CIVIL NO. 98-2213(JP)              14

chances of winning a title. Therefore, the fitness of the island's representative to the Miss Universe pageant is of general interest.

Further, defendant's conduct in publishing the pictures is relevant for purposes of determining the character of the use of the copyrighted material. See Haberman, 626 F.Supp. at 210. It is evident that at all times the readership of El Vocero knew that the pictures were not the original work of the newspaper. The photographs were the story itself and, at least, one article identified Plaintiff as the author of the photographs. Further, after the interview in the "La Comay" show, Burgos requested from Giraud her composite in order to scan several of the pictures. If a photojournalist asks for pictures to scan, it is expected that he or she will consider printing them. Further, Giraud never indicated that the pictures were not hers or that she was in any way impeded from giving away the pictures. Further, Plaintiff drove Burgos to where he could obtain the pictures involved in the controversy. Although Burgos should have been more forthcoming in informing Plaintiff that he intended to publish or consider publishing the pictures, not doing so does not suggest that he acted in bad faith. In addition, the Court finds that the purpose of printing the pictures was not to misappropriate or to compete with Plaintiff or to supplant Plaintiff's right of first

CIVIL NO. 98-2213(JP)            15

publishing.    See Harper & Row, Publishers, Inc. v. Nation

Enterprises, 471 U.S. 539 (1985) (the Court found that defendant's

purpose was to supplant the copyright holder's right of first

publication).    The pictures were already circulating around the

fashion industry at the time they were published.

    2.    **Nature of the Copyrighted Work**

        The   fair   use   defense   is   more   compelling   when

informational works are involved than when the works are creative.

See Brewer v. Hustler Magazine, Inc., 749 F.2d 527, 529 (9th Cir.

1984); Feiner v. H.R. Industries, Inc., 10 F.Supp.2d 310, 314

(S.D.N.Y. 1998).    Studio and session photography involves

creativity and could be considered an art form.    The Court finds

that in the instant case, however, the pictures were not displayed

for being artful or creative, but because they have a particular

content, namely whether or not these pictures could be considered

"pornographic" or scandalous enough to strip Giraud of her crown.

They also constituted the gist of the controversy between Teleonce

and Telemundo.    As stated above, the photographs are the story and,

despite the context in which they were taken, it is their content

that is essential.    The Court finds that this set of facts is

similar to having a newspaper reporting about a famous painting

which has been stolen and including a picture of the masterpiece.

CIVIL NO. 98-2213(JP)                16

It would be farfetched and implausible for the painter or the owner of the copyright to have a cause of action against the newspaper for copyright infringement.

By the same token, the amount and substantiality of the use of the pictures is of little or no consequence to our discussion because it would have been unreasonable to expect that an entity running a story on the pictures to print part of these.

**3.   Effect on the Market**

Finally, the Court must consider the effect of the publication of these pictures upon the potential market of each of them.  As stated above, this factor is the most important element of the fair use analysis.  See Haberman, 626 F.Supp. at 212. Rather than focusing on presenting arguments for the proposition that the publication hurt or could potentially hurt his business, Plaintiff states that the key word in the fair use analysis should not be actual damages, but potential damages and that because of its wide distribution, Defendant's "wreaked a real and substantial harm to Plaintiff's photographs."  This argument is insufficient and not compelling.

It is not the market for the pictures that Plaintiff should be emphasizing, but rather whether his business as a photographer could be hurt.  The pictures in question have already

CIVIL NO. 98-2213(JP)          17

been taken.   Their purpose is not to make money as they are not
bought,  but  distributed.    It  is  their  art  or  the  persons
photographed that are being promoted.   Unlike a book or a recording
that are purchased, it is uncontested that these pictures are
distributed to publicize models and photographers.    Under this
analysis, there is no evidence on the record for the proposition
that Plaintiff has been or could be hurt in his business as a
result of  the  unauthorized  distribution  of  his  photographs.
Plaintiff mistakes the use of the word "potential" for speculative,
and therefore, his position is not compelling.

In view of the above discussion, the Court determines
that Caribbean's use of the pictures was fair, and therefore,
hereby **DISMISSES WITH PREJUDICE** Plaintiff's claim for copyright
infringement.

**B.   UNFAIR COMPETITION LANHAM ACT CLAIM-TRADEMARK**

Plaintiff has also brought a claim under section 43(a) of the
Lanham Act arguing that Caribbean failed to designate him as the
origin of the photographs published.   Section 43(a) of the Lanham
dealing with false designation of origin is violated when any
"symbol" is used as a "'false designation of origin' or as any
'false representation,' whether or not a registered trademark is
involved."  Pirone v. MacMillan, Inc., 894 F.2d 579, 584 (2d Cir.

CIVIL NO. 98-2213(JP)            18

1990).  The basis of an action under Section 43(a) is the use of

a mark which is likely to cause confusion. See Veryfine Products,

Inc. v. Colón Brothers, Inc., 799 F.Supp. 240, 256 (D. Puerto Rico

1992) (Pieras, J.).  Although the pictures in question are symbols,

nothing in them indicates or suggest what their origin is or who is

their author.  See Pirone, 894 F.2d at 583-84 (stating that "a

photograph of a human being, unlike a portrait of a fanciful

cartoon character, is not inherently 'distinctive' in the trademark

sense to indicate origin.").

     Rather than a case actionable under trademark, the instant

case is more in line with copyright law.  A trademark seeks "'to

identify one seller's goods and distinguish them from goods sold by

others.'"  Leigh v. Warner Brothers, A Division of Time Warner

Entertainment Company, L.P., 10 F.Supp.2d 1371, 1379 (S.D.Ga. 1998)

(citations omitted).  In Leigh the Court emphasized that "the

better rule appears to be that the protection an artist receives

against infringement of his work arises under copyright law, not

the Lanham Act."  Id. at 1380.  In the instant case, there is no

evidence on the record for the proposition that Plaintiff has a

particular mark or symbol which distinguishes his photographs, but

rather, that Caribbean published Plaintiff's pictures.  Therefore,

Plaintiff cannot extend his Complaint to the area of trademark.  To

CIVIL NO. 98-2213(JP)                19

hold otherwise, as stated by the Leigh Court, "would ignore the identification requirement of trademark law, would overly extend the reach of trademark law, and would circumvent copyright law's prohibition on the protection of ideas." Id. at 1382.

In view of the above conclusion, the Court hereby **DISMISSES WITH PREJUDICE** Plaintiff's claim under the Lanham Act. Further, because the remaining claims are under Puerto Rico law, the Court will not exercise its pendent jurisdiction and also **DISMISSES WITH PREJUDICE** Plaintiff's causes of action under the Puerto Rico intellectual property law.

V.    **CONCLUSION**

Based on the above discussion, the Court hereby **DISMISSES WITH PREJUDICE** Plaintiff's Causes of Action under the Federal Copyright and Trademark Laws and under the Puerto Rico Intellectual Property Laws.

**IT IS SO ORDERED AND ADJUDGED.**

In San Juan, Puerto Rico, this 27th day of September, 1999.

JAIME PIERAS, JR.
U. S. SENIOR DISTRICT JUDGE